Good morning. May it please the Court, Amy Cleary on behalf of Appellant Deandre Cotton. I'll watch my time and I'll try and reserve three minutes for my rebuttal. Mr. Cotton went to trial. At his trial, a witness, his cousin, Joshua Norgaard, took responsibility for the firearm and the marijuana that was in the backpack in the car that Mr. Cotton was driving. I'd like to focus today on the government's handling of Mr. Norgaard's testimony below during the closing argument. The government, in submitting to the jury, overstepped in several ways. The most egregious, in my opinion, is the government's handling of Mr. Norgaard's supposed collusion with Mr. Cotton. The government may make and ask the jury to make reasonable inferences based on the evidence presented at the trial below. The government may not ask the jury to imagine things that are not in the evidence. What the government did several times below was to ask the jury to imagine a scenario. And when questioned by defense counsel and when defense counsel objected, the government's retort was, it's not completely impossible. It's not completely implausible. That is not the standard. The government has a duty, especially as a member of the U.S. Attorney's Office, to stay well within the bounds. And when you ask the jury to make inferences that are not based on the evidence, that attorney has overstepped. We know that the U.S. Attorney's conduct in this case did have an effect on the jury. There were several jury questions that were submitted, and those are in the sealed excerpts of record. There was four questions. When the U.S. Attorney made these comments to the jury, they were preferenced with the U.S. Attorney's statement that Mr. Cotton and Mr. Norgaard knew about the double jeopardy principles. Again, that wasn't in the record. The double jeopardy principles explained to the jury by the U.S. Attorney were that Mr. Norgaard and Mr. Cotton knew that Mr. Norgaard could not be in trouble if he, quote, unquote, took the fall for this evidence, and Mr. Cotton came in later if he were acquitted in this federal trial and took responsibility for it later. One of the jury's questions was, did Mr. Cotton, has he been incarcerated since his arrest in this case? Did he pose bail, meaning was he incarcerated during this entire time? Was the state aware that Mr. Norgaard was a witness? Did the defense know that Mr. Norgaard was a witness? All of these questions are pulled from statements that the U.S. Attorney made during closing, such as the attorney said, Mr. Norgaard came out of basically whole cloth. We don't know where he got his information from. Did it come from the discovery? One of the things that is indicative of these types of statements that Mr. Norgaard and Mr. Cotton colluded was that the supposition that somehow Mr. Cotton was subverting or suggesting that Mr. Norgaard commit perjury or telling him what to say. There was no evidence of that. The evidence at trial was that twice. Mr. Norgaard said when he was questioned by the government, what were you told? What did Mr. Cotton tell you to say? And his testimony was, he told me to say the truth. There were no tapes. There were no jail calls. There was none of that. At the beginning of the prosecutor's statement that you quote in your brief, the prosecutor says, I submit the reason why a few months ago Norgaard randomly decided to research the law was because da, da, da. What's the evidence with respect to his researching the law? Mr. Norgaard stated that he began to search the law because he wanted to know what he could be facing. That was the inference that came from that. He wanted to know what his liability would be by saying that he, by confessing to what he did. By confessing to what he said he did. Correct. And so, just to explain a little further, the prosecutor told him as a habitual smoker of marijuana, did he understand that he was committing a felony? And Josh Norgaard said, yes, I know. I know him. But I'm confessing. I also just want to touch briefly on the government. And this isn't just one thing. The government also commented many times and shifted the burden of proof in this case. With regard to comments on Mr. Cotton's failure to take the stand. Now, I admit, the government didn't specifically say Mr. Cotton didn't take the stand. The government did it a lot more tactfully. When the government repeatedly said there's no other corroboration to Mr. Norgaard's testimony, the only other person. And why isn't that a fair comment? It's not a fair comment in the circumstances of this case. Because the government knew that the defense could not bring in Caitlin Scott, the passenger. Right. So there's no, why isn't it a fair comment to say, the only thing, jury, that you've got in front of you is the testimony of Joshua Norgaard. And here's why you shouldn't believe him. And there's no other corroborating evidence. Yes, indirectly, that calls into question that the defendant didn't testify. But why is that inappropriate? Because of the very reason you said, Your Honor. Because by directing even indirectly, I don't mean to. Do we have any cases that suggest this? I do. That's a pretty strong rule if you can't comment on the state of the evidence. You can comment on the state of the evidence. But if doing so in a case where the defendant does not testify, you are directing the focus of the jury. What's your best case? Cabrera, Your Honor. It's cited in the government's brief. And the government relies on it. And what the government doesn't say in Cabrera is that the defendant testified in that case. So by the government. All right. I mean, I'd love to see a case where we reverse somebody because the government said there's no corroboration of this witness's testimony. And I would submit Cabrera is our best case. The cases where the defendant testifies are completely separate and apart from a case where the defendant did not testify. What's the difference between the prosecutor saying there's no corroboration on the one hand and instead saying the only evidence we have is? Because I assume they can say, the prosecutor can say, the only evidence of this that we have is the testimony, blah, blah, blah. And it is a fine line, Your Honor. It is. And you can look at Mr. Norgaard's testimony and you can ask the jury to make inferences regarding his testimony and ask the jury to assess his credibility. But you can't ask them to imagine that he colluded and you can't ask the jury to say, why didn't they bring in anything else? Why didn't they bring in any other witnesses? Why didn't they bring in this? Because the defendant never has a burden to do anything. And in a case like this, especially when the government knows that there was another witness that the defense couldn't secure. Are we on plain error on this question? Well. Was an objection made? An objection was made with regard to the burden shifting. An objection was made with regard to the collusion, to the closing. To the closing argument? Bits and pieces. And I'll answer this in two parts. When an objection is made individually to part of a closing, the review is under the manifest weight of the evidence. When an objection is not made to a particular moment in the closing, it's plain error. When you review it cumulatively, the court looks at it under plain error. When you look at it individually, you can do it under manifest weight. But I think we submit under either standard, whether you look at it individually or under plain error, Mr. Cotton meets the standard because his trial, this case, this misconduct, and we go through it ad nauseum in our brief, all the various oversteps, this misconduct steps over that line that prosecutors seem to stay well within. We submit that there should be a retrial, which is why I'd like to address very quickly the continuous issue on the motion to suppress. When Mr. Cotton, his defense counsel, attempted to secure two of the witnesses on the suppression issue, the magistrate judge went through the Flint factors. There was no question that his defense counsel was diligent in securing and trying to secure the witnesses. The Flint factor regarding utility, which is whether there would have been at least probably the defense witnesses that he tried to secure, the security guard and the passenger, would have been helpful to the magistrate judge's assessment of whether those two witnesses would have been helpful to the magistrate judge. Had he been given more time to secure them or whether he could have obtained the subpoena on them, we know that he probably would have been helpful or been able to subpoena them with regard to the security guard, because the security guard was subpoenaed before and he was subpoenaed for the trial. We think it would have been probably he would have met that standard for the passenger driver. He only needed a few, several weeks to try and do so. I think it was an abuse of discretion for the district court not to do that because they never tried or allowed him to try to use the court resources to bring her in. Now, is that the best way to get a favorable witness into court? No. To bring, to have someone, you know, as a material witness or have someone bring contempt in to bring her in? No. But is that a step that he should have been entitled to try and take if he couldn't get his own investigator in to bring her in when that is testimony, live testimony that should have been used and brought before the magistrate so he could assess her credibility when that same magistrate already had credibility issues with one part of the officer's testimony? Yes. Okay. Now, you wanted to save three minutes. You're down to two. Do you want to save what you've got left? I absolutely do, Your Honor. Thank you. Yeah. Good morning. May it please the Court. Good morning, Counsel. Elizabeth White for the United States. I'd like to start with the government's argument at close about Mr. Norgaard. And I would first direct the Court's attention to page 37 of the excerpt of record. This is from the government, from the prosecutor's statement. He says, now, here's another thing. And before I get into this, I want to make a really important point. The defendant in a criminal case has zero burden. The burden lies here with me and Mr. Smith, the government. Mr. Ingratz and the defendant can sit through the entire trial. They can twiddle their thumbs. And if we don't meet our burden, we call 50 witnesses and they just sit there and watch. And if we don't meet our burden, you are duty-bound to render a not guilty verdict. That's how it works. But here's the other thing in conjunction with that, is that when the defendant elects to start calling witnesses and presenting a story, it's okay for us to point out things that he could have presented in addition to that. And in particular with this witness and with the story that this witness was telling. For example, he said that he left, that he's the one who had the backpack with the drugs and the gun, and he just put a bunch of the defendant's stuff in the backpack and then he left it in the back of the car. And that when he realized 10 minutes later that he had left it in the back of the car, he tried to call Mr. Cotton, but he couldn't get through. The government said, you know, there would be phone records to corroborate that. There would have been a text message or phone records that they could have gotten if they wanted to come in. Mr. Norgard said that Mr. Cotton's car was towed back to the apartment that they shared, and that he had to sign a receipt to get the car released to him, and that's where he found the backpack with the notebook in the backseat of the car. You know, where's this tow receipt? And what the government said is, listen, you bring this witness in at the very last minute. I mean, we did not know about this witness until opening statement when the defense counsel said, we've got this witness and it's his drugs and his gun. And at that point, we can't do any investigation, right? I mean, we've just got this one guy telling this story that is completely implausible, that is contrary to so much of the other evidence. I mean, he said he testified, for example, that this was his gun in the bottom of his backpack and that he had never told Cotton about the gun, that Cotton did not know about the gun, that he never knew about the gun. And yet, when the officer found the gun in the backpack and took the gun out of the backpack, Mr. Cotton, who's sitting in the backseat of the police car, says, oh, that doesn't even work. The firing pin is broken, which it was. But Mr. Norgard had said that Mr. Cotton had no idea that he had this gun because he had never told him about this gun. I mean, so throughout the story that Mr. Norgard is telling, there are just over and over and over things that don't make sense and are contradicted. He said he was a very heavy marijuana smoker and that he bought an ounce of marijuana. He says he's a habitual marijuana smoker. He said he bought an ounce of marijuana. He also said that an ounce is 14 grams. And as we pointed out in our closing, someone who's a habitual marijuana smoker would know that that's incorrect. Either that or he's getting ripped off quite a bit. Either that or he's getting ripped off. And then he said that he packaged it. He would get this ounce of marijuana, and then he would package it into small baggies so that he'd have one for Monday, one for Tuesday, one for Wednesday. But then he had all of it in the bag, and then he said that he had all of it in the bag because he was going to smoke it all that night while he was on his way to go to a date. He said Mr. Cotton was giving him a ride to this date and that the date did not smoke marijuana. So, I mean, just none of the things that he was saying. He said that when the car was towed, which, by the way, we had the release that Mr. Cotton signed so that they would not tow the car. I mean, the evidence in the record was that the car was not towed. But Mr. Norgaard said that it was towed, and when they got back to the apartment, he found the notebook in the back seat. Well, the police had seized the notebook, so the notebook was in evidence. So that was just not true, too. So what we have is this friend, or I think they're cousins of Mr. Cotton, comes in the day of trial and says, you know, it's my drugs. I know it's packaged in a way that looks like it's packaged for distribution, but that's just how I package my drugs, and it's my gun that he doesn't know about, even though he happens to know that the firing pin is broken. And I didn't say anything for two years. I didn't come forward because I was afraid of going to jail. And now, a couple weeks, a couple months ago, I think he said a couple weeks ago, I started researching to realize that, in fact, yes, these are felonies that I'm up here admitting to, but now I'm not afraid of going to jail. For two years, I didn't come forward because I was afraid of going to prison, you know, and now I'm just not because my cousin has been in custody for two years and I just need to do the right thing. So when the defense chooses to put, and we made that very clear to the jury, they have no burden at all. They do not have to put on any witnesses, any evidence. But when they do, and when what they put on is implausible, contrary to the other evidence in the record, we have a right to point that out. And when the story that they tell would, by necessity, have corroborating evidence along with it, but they don't present that corroborating evidence, they don't present the cell phone, they don't present the tow receipt, they don't, you know, present the backpack and the notebook and the other things that would have corroborated their story, we have the right to point that out too. With respect to the suggestion that the defendant and the witness may well have concocted this story, I think that there's clear evidence from which we can infer that this was a concocted story. I mean, just because the things that he was saying do not match with the evidence at trial. I mean, the things that Mr. Norgaard was testifying to simply are contrary to the evidence at the trial. Now, this idea that the reason that they concocted this story and that the reason that Mr. Norgaard, you know, said for two years he was afraid to go into prison and now all of a sudden he's not, well, you know, it's plausible that he understands that he comes in and gets Mr. Cotton off and then he goes to trial and Cotton comes in and says, oh, you know what, that was mine. It's a plausible story. There's, there's, it's a plausible story and nothing in the, no evidence in the record contradicts it. And this is why it's different from Bluford. I think that the, I think the defendant is really just sort of turning Bluford on its head by saying, I mean, they say that in Bluford at least the government had some evidence of phone calls and that somehow this is worse. But, in fact, the problem in Bluford is that the government had phone calls and those phone calls did not, I mean, absolutely did not support the story and, in fact, in some cases contradicted the story. And that was the problem with the government making this assertion in their closing argument when they knew, I mean, what they said in the closing was that these phone calls confirm that they had concocted this story when, in fact, they did not. Here's my problem. Not that the prosecutor can't suggest that this is a concocted story. There's plenty of evidence to suggest that this is a concocted story. Yes. Norgaard's testimony has just hole after hole after hole. We know that they're related. We know that they talk. We know from his own testimony that he's looked up whether he's liable. Where the government says something that maybe doesn't have any evidence supporting it is that they know what's going to happen if Norgaard is tried on double jeopardy. Because you're saying they know this. Well, maybe they do, maybe they don't. Yeah. So how do you justify saying that? Yeah. I think that what they, let me just find exactly what they said. Mr. Ingrid's, the defense counsel, was a champion of, this is at 42, excerpt of record, was a champion of the Constitution not only when my colleague was arguing but when we were arguing to you. And one of the other things the Constitution says is there's a prohibition against double jeopardy, meaning once a person is committed, acquitted of a crime, they can't be tried again. So imagine this scenario. And then he says, Mr. Cotton and Mr. Norgaard hatch a plan where he'll come in and take responsibility and they'll come in and take responsibility. And what he says is that this is, it's plausible. Now, what I would argue is I would think that the better practice would be not to do this. I don't know, I don't know that this crosses the line. I mean, this isn't like Bluford. There's, we don't have any evidence that this is not what happened. And in Bluford, the government actually had evidence that contradicted the scenario that they were painting. But I would say that even if, even if this is, this crosses a line and shouldn't have been done, in the context of the closing argument as a whole, and in particular in the context of the absolute clear inference that Mr. Norgaard's story was concocted, this, if it was error, would be harmless. Roberts. Would you turn to the sentencing question? And I'm particularly concerned about the qualifying convictions and as to whether those are qualifying convictions. Sure. And I will say, I will say just in case you're, in case you're curious about it, we did not, we did not make an argument about them maintaining a drug place. And in reading through everything and preparing for this argument, I think that was probably a mistake we should have. And we had argued in our brief that, that they were making an argument for the first time on appeal, and they shouldn't, the Court shouldn't consider this for the first time on appeal. I've read back through the — You had to have two qualifying convictions. Yeah. Yeah. And your two qualifying convictions then was the battery, the Category C battery and the possession of contraband of — Possession for sale. Yeah. Possession for sale. Yeah. Okay. And so, so those are the two that we're relying on. And to the extent that, that we just messed up by not arguing the other one, I apologize, but I take responsibility for that. Well, is there any reason why we shouldn't, if we convict, remand for resentencing? Well, if, if, if we get Nevada battery causing substantial bodily harm and Nevada possession with intent to distribute or with intent to sell the drugs, if we get those two, then the third one doesn't matter. And so that is our, that is our argument that we get those two. Now, on possession, possession for sale, we have an inquiry into the Nevada Supreme Court right now. Yes. If we're going to have to count that one, we probably, we may have to wait. Yes. Okay. Yeah. But if we, if the battery doesn't count, then we don't have to wait. Yes. Okay. Okay. So tell me about the battery. Okay. So Nevada defines, defines substantial bodily harm as bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ or prolonged physical pain. What the, what the Supreme Court said is that the force necessary to constitute a crime of violence has to be violent physical force. That is force that is capable of causing physical pain or harm. Okay. And the Court in Johnson also referred, specifically used the phrase merestouching is not the violent physical force necessary. Exactly. Exactly. Okay. So what do we do with Collins? The Supreme Court's 2009 decision in which the Court refers to the merestouching. Now, what's different about that is that the Nevada Supreme Court says the merestouching of someone who's suffering third-degree burns, but it's using the phrase merestouching. That, that is one. It's a curious, it's a very curious question. It is, and in fact what it is. It is one phrase in one sentence that is quoting dicta from a Second Circuit case. So what, what they're saying is, you know, pain is a fluid concept and as the Second Circuit noted, you know, punching a gymnast in the solar plexus might not cause any pain at all, but touching somebody with third degrees could, third-degree burns could cause excruciating pain. That was a phrase of dicta that was completely separate from what the Court said in Collins. What the Court held in Collins is that prolonged physical pain, the term pain is necessarily subjective. That's where they're quoting the Second Circuit. But then they say the pain falls within the statutory definition when the victim subjectively experiences pain and some physical suffering. Now that is what Johnson, that is how the Supreme Court defined violent force, force capable of causing physical pain. Now the defense, as I read this decision, or as I read their argument, what they're arguing is that the Supreme Court in Johnson wasn't specific enough and that pain, you know, isn't good enough. And that's an argument that they need to take up with the Supreme Court because the Supreme Court said what it said and that's the law that this Court is required to apply. Now, just to be clear, in Collins, the defendant struck the victim in the face, knocking him unconscious. He had extreme pain in his head. The CAT scan showed a right temple fracture and for weeks he experienced dizziness. He couldn't bend over without almost passing out and had intermittent headaches for weeks. So, I mean, Collins is not a case where there was a mere touching of someone with a third degree burn. That was a hypothetical that has never happened as far as I'm aware of. I don't know that that conviction would be sustained, but it certainly wasn't in Collins. And the other two cases, Nevada cases, La Chance and Holland, you know, in Holland, which they say, they cite as saying that that was a case where the defendant merely struck the victim. Well, he punched him in his jaw, knocking off his hat and glasses, his, screwed up the alignment of his jaw and his teeth to the point that the defendant, his jaw pops, he has trouble chewing and he can't sleep on his left side without pain medication. So that, again, I mean, I think that the cases that they cite show very clearly that in Nevada, battery was substantial bodily harm. Would he be concerned about hops and spitting? Was that a substantial bodily harm case? I don't think so. I mean, I think the one thing, just to be clear, I mean, simple battery, and this is what the Supreme Court found in Johnson and what we've acknowledged. Simple battery under Nevada law does not qualify because that is the merest touching. I mean, that is any unwanted physical touching can be a battery. I think hops may have been a simple battery. Yes. But once you're talking about substantial bodily harm, you know, the other thing is this Court has recently held that battery with the use of a deadly weapon in Nevada law qualifies as a crime of violence, and that is because Nevada defines deadly weapon as a weapon that either inherently or in the way that it is used, it could cause substantial bodily harm. So you'd like us to wait for Figueroa or Beltran? Yes. Yeah. I'm well over my time if the Court has other questions. I think not. Thank you. Thank you. Would you please put three minutes on the clock? Thank you, Judge Fletcher. If I could follow up on that, Judge Bybee, on where we are with sentencing. We actually don't need you to wait if you're not with me on the trial issues with regard to the sentencing. Substantial bodily harm under Nevada, Collins decides that. We're not quibbling with the Supreme Court's definition in Johnson. We're good to go on that. Nevada's definition of substantially bodily harm is way too broad, so it's our position that the District Court made an error below. So what's too broad in Nevada? The definition of pain because their definition that the government cited, we agree with. If you can touch someone who has a third-degree burn and that's substantial bodily harm, that's well broader than Johnson's violent physical force. So Nevada's statute defining substantial bodily harm for purposes of Nevada battery is too broad. The problem is that touching someone that you know has suffered third-degree burns is still not violent physical force, even though it's going to cause excruciating pain. Correct. It's just the way the statute's written. We're going under statutory definition. You're applying the categorical approach. So because the different — because the government didn't challenge the conviction for — And the — and we can rely on that, even though this is dicta. The government says, well, that's — it's — it was just an analogy. It was drawn from a Second Circuit case. I don't agree that it's dicta. They were specifically defining what pain is and what substantial bodily harm is in the context of the definition for Nevada. They were — that was a very short opinion. It had a very specific purpose. They were deciding whether the definition was constitutionally vague. I don't think that that's dicta. That was the Nevada Supreme Court setting that out for the court for the purposes of constitutionality. But as I read Johnson, it says, or force capable of causing physical pain or injury to another person. Well, so a very slight touch will do it, but there's no dispute that there's some touches that will cause very substantial pain. I mean, that's the point of the quotation. But we're missing the violent, physical, violent. So it's very specific. It's not just the pain part. It's the violent, physical force. Well, but as I read Johnson, it's either violent force or force capable of causing the pain. But there's — so we're missing the force. Well, force means slightest touch. I mean, it's not violent force. I concede that. But it's force, that is to say there is some impact and it causes severe pain. Correct. But then we're talking — we're missing the force because it could be minimal touching. So in that regard, the Nevada statute is overbroad. Well, the intent element isn't missing there, right? I mean, an inadvertent brushing of someone who suffered third-degree burns might cause excruciating pain. I assume that would not be a violent battery under Nevada law if it was inadvertent and not intentional. Correct. Well, you need the intent, but it's not there. But someone who deliberately touched someone who had suffered third-degree burns would cause excruciating pain. Correct. And that's still not sufficient? I still think the statute is overbroad for purposes of the categorical approach. Well, what would be overbroad? Give me a scenario that would be overbroad. Well, if you need the intent for it to be a crime of violence, that intent is not included for substantial battery. You only need to have the intent to do the action, not the intent to do the harm. I'm sorry, I have them backwards. Can you point to a case that applies the mens rea requirement of willfulness in Nevada battery causing substantial bodily harm to the intent to cause substantial bodily harm rather than the intent to use force? Well, the Supreme Court said I don't need to show a case. If the statute on its face says that it's overbroad, I don't need to show a real-life case. All right. Thank you. Could I just clarify one thing with regard to the government statements regarding nothing contradicting the collusion argument? Yeah, you're over, but, yes, if you want to make that point, please do. It's not enough that there's nothing in the record that contradicts the fact that there's no evidence of collusion. That's not how it works. The government has to have a good-faith belief that there was collusion. The fact that there was no evidence, that's not sufficient. Okay. Thank you. Okay. Thank both sides for their arguments. United States v. Cotton now submitted for decision.
judges: D.W. Nelson, W. Fletcher, Bybee